JENNIFER R. SCHWARTZ (OR Bar No. 072978) (*Pro Hac Vice*)
Email: jschwartz@wildearthguardians.org
LINDSAY K. LARRIS (CA Bar No. 254270)
Email: llarris@wildearthguardians.org
WildEarth Guardians
P.O. Box 40490
Portland, OR 97240
Telephone: (503) 780-8281

*Counsel for Plaintiff*

Jennifer L. Williams (CA Bar No. 268782)
Email: jenn@summallp.com
SUMMA LLP
1010 Sycamore Avenue, Unit 117
South Pasadena, California 91030
Telephone: (213) 260-9452/54
Facsimile: (213) 835-0939

*Local Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILDEARTH GUARDIANS, | ) Case No.: 2:24-cv-02281-WLH-RAO |
| | ) |
| Plaintiff, | ) **PLAINTIFF'S NOTICE OF** |
| vs. | ) **MOTION, MOTION FOR** |
| | ) **SUMMARY JUDGMENT, AND** |
| UNITED STATES FISH AND | ) **SUPPORTING MEMORANDUM** |
| WILDLIFE SERVICE and DEB | ) |
| HAALAND, in her official capacity as | ) Hearing Date: April 11, 2025 |
| U.S. Secretary of the Interior, | ) Hearing Time: 1:30 PM |
| | ) Hon. Wesley L. Hsu |
| Defendants. | ) |

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on April 11, 2025, or as soon thereafter as it may be heard, Plaintiff WildEarth Guardians ("Guardians"), will bring for hearing its Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and this Court's Scheduling Order (Dkt. No. 19). The hearing will take place before the Hon. Wesley L. Hsu.

Guardians moves for summary judgment on the ground that there is no genuine dispute as to any material fact and its entitled to judgment as a matter of law. For the reasons set forth below, Defendants the Secretary of the Interior and the U.S. Fish and Wildlife Service ("Service") violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.*, in issuing a decision that listing Joshua trees (*Yucca brevifolia* and *Y. jaegeriana*) as threatened species under the Act was "not warranted."

Guardians respectfully requests this Court to find and declare that the Service acted arbitrarily and capriciously and violated the ESA in issuing the "not warranted" listing decision. Guardians also asks this Court to set aside and remand the unlawful listing decision for further agency action consistent with this Court's opinion and order.

Guardians' Motion is based on the points and authorities set forth below and the amended administrative record lodged with the Court by Defendants on September 24,

2024 (Dkt. No. 22). Guardians' standing to pursue this action is set forth in Plaintiff's Compl. ¶¶ 13-15 (Dkt. No. 1), as well as in the attached declarations of Erica Prather, Hop Hopkins, and Jerod Partin. A Proposed Order accompanies this Motion.

Dated this 3rd day of October, 2024.          Respectfully submitted,


_/s/ Jennifer Schwartz_

JENNIFER R. SCHWARTZ
WildEarth Guardians
P.O. Box 40490
Portland, OR 97240
Telephone: (503) 780-8281
Email: jschwartz@wildearthguardians.org


_Lead Counsel for Plaintiff_

# TABLE OF CONTENTS

Table of Authorities .................................................................................................... vi

List of Acronyms ......................................................................................................... ix

INTRODUCTION ......................................................................................................... 1

LEGAL FRAMEWORK ............................................................................................... 2

FACTUAL BACKGROUND ....................................................................................... 4

I.    Joshua Trees in a Hotter, Drier, More Fire-Prone, and Developed Mojave Desert ..... 4

    A.    Primary Threats to the Joshua Tree's Continued Persistence ........................... 5

        1.    Climate Change ........................................................................ 6

        2.    Wildfire ................................................................................. 18

        3.    Habitat Loss from Development ............................................... 21

II.   Listing Petition and History ................................................................................. 22

III.  The Service's 2023 Remanded Listing Decision ..................................................... 23

STANDARD OF REVIEW .......................................................................................... 25

ARGUMENT ............................................................................................................... 26

I.    The Service's Listing Decision Runs Counter to the Best Available Science ........... 27

    A.    The best available science shows Joshua trees are threatened by climate change ..... 28

    B.    The best available science reveals the cumulative effects of climate change, wildfire, expanding development, naturally low germination rates, and an extremely limited dispersal capacity collectively threaten Joshua trees ..... 30

    C.    The scientific evidence is sufficiently certain to support listing Joshua trees ..... 32

II.    The Service's "foreseeable future" timeframe is arbitrary and contrary to the ESA .................................................................................................................. 37

III.   The Service arbitrarily determined that Joshua trees are not threatened throughout any significant portions of their range. ......................................................... 43

CONCLUSION .......................................................................................................... 44

CERTIFICATE OF COMPLIANCE ........................................................................ 46

CERTIFICATE OF SERVICE .................................................................................. 47

# TABLE OF AUTHORITIES

**Cases**

*Alaska Oil & Gas Ass'n v. Jewell,*
    815 F.3d 544 (9th Cir. 2016)................................................................40

*Alaska Oil and Gas Ass'n v. Pritzker,*
    840 F.3d 671 (9th Cir. 2016)...................................................... 3, 26, 37

*Alaska Oil and Gas Ass'n v. Ross,*
    722 Fed. Appx. 666 (9th Cir. 2018) ............................................... 33, 40

*Am. Wildlands v. Norton,*
    193 F. Supp. 2d 244 (D.D.C. 2002) ...................................................27

*Bauer v. DeVos,*
    325 F. Supp. 3d 74 (D.D.C. 2018) ....................................................36

*Brower v. Evans,*
    257 F.3d 1058 (9th Cir. 2001)...........................................................33

*Building Indus. Ass'n of Superior Cal. v. Norton,*
    247 F.3d 1241 (D.C. Cir. 2001) ........................................................27

*Citizens of Overton Park v. Volpe,*
    401 U.S. 402 (1971)...........................................................................25

*Ctr. for Biological Diversity v. Fish & Wildlife Serv.,*
    342 F. Supp. 3d 968 (N.D. Cal. 2018) ...........................................36

*Ctr. for Biological Diversity v. Haaland,*
    998 F.3d 1061 (9th Cir. 2021)................................................ 39, 41, 42

*Ctr. for Biological Diversity v. Zinke,*
    900 F.3d 1053 (9th Cir. 2018)............................................. 27, 34, 43

*Defenders of Wildlife v. Babbitt,*
    958 F. Supp. 670 (D.D.C. 1997) ..................................................... 4, 27, 33

*Defenders of Wildlife v. Jewell,*
    176 F. Supp. 3d 975 (D. Mont. 2016)................................................3, 34

*F.C.C. v. Fox Television Studios Inc.,*
    556 U.S. 502 (2009)............................................................................41

*Greater Yellowstone Coal. v. Servheen,*
    665 F.3d 1015 (9th Cir. 2011)............................................ 27, 30, 32-34

*In re Polar Bear,*
    709 F.3d 1 (D.C. Cir. 2013) ............................................................26

*Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)............................................................ 26, 30, 32

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) ............................................................25

*Nw. Coal. for Alternatives to Pesticides v. EPA,*
    544 F.3d 1043 (9th Cir. 2008)............................................................25

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014)............................................................27

*Sw. Ctr. for Biological Diversity v. Babbitt,*
    215 F.3d 58 (D.C. Cir. 2000) ............................................................33

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978)............................................................................2

*Trout Unlimited v. Lohn,*
    645 F. Supp. 2d 929 (D. Or. 2007) ............................................................26

*United States v. TRW Rifle,*
    447 F.3d 686 (9th Cir. 2006)............................................................39

*W. Watersheds Project v. Foss,*
    2005 WL 2002473 (D. Idaho 2005) ............................................................26

*WildEarth Guardians v. Haaland,*
    561 F. Supp. 3d 890 (C.D. Cal. 2021) ............................ 1, 23, 29-31, 26, 43

**Statutes**

5 U.S.C. § 706............................................................................25

5 U.S.C. § 706(2)(A)............................................................................25

16 U.S.C. § 1531(a)(1)................................................................................2

16 U.S.C. § 1532(6)...............................................................................3, 43

16 U.S.C. § 1532(20) ...................................................................3, 26,29,37

16 U.S.C. § 1533.......................................................................................3

16 U.S.C. §§ 1533(a)(1)(A)–(E)..................................................................3

16 U.S.C § 1533(a)(1)(E)...........................................................................31

16 U.S.C. § 1533(b)(1)(A) ......................................................................3, 44

16 U.S.C. § 1533(b)(2)...............................................................................3

16 U.S.C. § 1533(f) ...................................................................................3

16 U.S.C. § 1536(a)(1)...............................................................................2

16 U.S.C. § 1536(a)(2)...............................................................................3

**Regulations**

50 C.F.R. § 424.11(c)................................................................................30

50 C.F.R. § 424.11(d)...............................................................................38

**Federal Register Notices**

84 Fed. Reg. 41,694 (August 15, 2019).........................................................22

84 Fed. Reg. 45,020 (August 27, 2019)....................................................26, 38

87 Fed. Reg. 76,882 (Dec. 15, 2022).............................................................42

# LIST OF ACRONYMS

| | |
|---|---|
| BLM | Bureau of Land Management |
| CDFW | California Department of Fish and Wildlife |
| CESA | California Endangered Species Act |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| IPCC | Intergovernmental Panel on Climate Change |
| NPS | National Park Service |
| JTNP | Joshua Tree National Park |
| RCP | Representative Concentration Pathway |
| SDM | Species Distribution Model (also known as an "ecological niche model") |
| SPR | Significant Portion of its Range |
| SSA | Species Status Assessment |
| YUBR | *Yucca brevifolia* |
| YUJA | *Yucca jaegeriana* |
| USGS | United States Geological Survey |

## INTRODUCTION

As an important cultural resource for Native peoples, an iconic symbol of California deserts, and a keystone species that provides food, shelter, nesting sites and, in times of drought, life-giving moisture for numerous birds, mammals, reptiles, and insects, the loss of Joshua trees would undoubtedly have a profound cultural and ecological impact that reverberates throughout the Mojave Desert and beyond. While this irreplaceable species is already suffering declines from increasing temperatures, prolonged drought, ferocious wildfires, and expanding development, end-of-century projections are bleak. *Every* published bioclimatic model available agrees that climate change will render Joshua trees functionally extinct over most of their range by 2100. This time interval is barely one generation for this long-lived species. Despite recognizing this grim scientific consensus, the Service once again refused to list Joshua trees as threatened species under the ESA.

The Service's 2023 listing decision suffers from many of the same errors previously identified by this district court in *WildEarth Guardians v. Haaland*, 561 F. Supp.3d 890 (C.D. Cal. 2021) ("*Guardians I*"). The Service once again insists that Joshua trees are not threatened by climate change or the cumulative effects of all key stressors combined, because *adult* Joshua trees will still "occupy" habitat that is forecasted to become unsuitable for young plants to survive. For long-lived species with long generation times like the Joshua tree, recent scientific literature refers to these adult individuals that were able to

1

mature before climate change impacts were realized as "the living dead," still standing but unable to successfully recruit new generations.

The Service reached its decision, in part, by arbitrarily shortening the timeframe for evaluating the impact of future threats to just 17-47 years from the present. Limiting its listing determination to 2040-2060 ignores the best available science showing Joshua trees will be in danger of extinction by 2100 and requires more conclusive evidence than the ESA allows. This is too short a timeframe to examine the effects of stressors *at least* one generation into the future, which for Joshua trees is 50 to 70 years. The Service also failed to properly evaluate whether listing is appropriate in a "significant portion" of the Joshua tree's range. Guardians thus turns to this Court once more in hopes of obtaining threatened status for these beloved plants, invoking our federal government's affirmative duty to halt species extinction.

## LEGAL FRAMEWORK

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It represents a commitment "to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184; 16 U.S.C. § 1531(a)(1). Species listed under the ESA receive extensive protections to propel their survival and recovery, including requirements that all federal agencies use their authority to further their conservation, *id.* § 1536(a)(1), and ensure their

actions do not jeopardize them, *id.* § 1536(a)(2); detailed recovery planning, *id.* § 1533(f); and protections for their most important habitat, *id.* § 1533(b)(2).

The ESA directs the Service to determine whether species should be listed as "threatened" or "endangered." *Id.* § 1533. An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). This decision must be based on careful review of the ESA's five threat factors (both individually and in the aggregate), *see* 16 U.S.C. §§ 1533(a)(1)(A)–(E), and be premised solely on the best available science. 16 U.S.C. § 1533(b)(1)(A).

Using the best available science does not require "ironclad and absolute" science. *Alaska Oil and Gas Ass'n v. Pritzker*, 840 F.3d 671, 680 (9th Cir. 2016).[1] Indeed, the Service cannot deny ESA protections for a species by insisting on greater scientific certainty than the best available science can provide. *Defenders of Wildlife v. Jewell*, 176 F.Supp.3d 975, 1000l-02 (D. Mont. 2016). As the D.C. district court also explained:

> The statutory standard, requiring that agency decisions be made on the "best scientific and commercial data available," rather than absolute scientific certainty, is in keeping with congressional intent in crafting the ESA. Congress repeatedly explained that it intended to require the FWS to take preventive measures *before* a species is "conclusively" headed for extinction.

---

[1] Cases have been cleaned up, with internal citations omitted, unless otherwise noted.

*Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679-80 (D.D.C. 1997).

## FACTUAL BACKGROUND

### I. Joshua Trees in a Hotter, Drier, More Fire-Prone, and Developed Mojave Desert

Their unique silhouette and tall stature make Joshua trees one of the most recognizable native plants of the Mojave Desert. 0003931; 0007733. Long addressed as a single species with two subspecies, the Service considers Joshua trees as comprising two distinct and separately listable entities: the western Joshua tree (*Yucca brevifolia*) and eastern Joshua tree (*Y. jaegeriana*). 0000018. The two species are geographically separated, genetically and morphologically distinguishable, and each rely on their own unique obligate pollinator—a yucca moth. 0000029; ECF No. 2 (Complaint), ¶ 35.

Joshua trees are characterized by infrequent germination, slow growth, long lifespans (reaching up to several hundred years but averaging around 150 years), and long generation time (50 to 70 years). 0000013, 0000033. It can take 30 to 70 years before an individual tree matures and flowers. 0000013. Each Joshua tree depends on a single species of yucca moth to reproduce sexually. 0000029. Overall, successful recruitment requires a rare convergence of events: fertilization by unique pollinators; seed dispersal and caching by rodents; seedling emergence triggered by late-summer rainfall and high soil moisture; adequate amounts of annual precipitation (4.7-16.9 inches), including late summer monthly precipitation in excess of 1.1 inches; nurse plants (i.e., vegetation like shrubs that

4

provide microclimates for successful germination and protection from herbivory); and appropriate seasonal temperature ranges (i.e., between 67–91°F in summer and 29–50°F in winter). 0000027-43; 0007741-46; 0009783-89. Studies suggest successful establishment of new Joshua tree seedlings happens only a few times in a century. 0007741.

As the Service recognizes, Joshua trees require stable or increasing population growth that can only be achieved through successful reproduction, survival of young age-classes, and sufficient recruitment to support the next generation in order to persist as a species. 0000062; 0000337. Seedlings and juveniles, however, are highly vulnerable to climatic changes, wildfire and herbivory with high mortality rates. *See e.g.*, 0000034-36; 0000089-90; 0007741-46; 0007733-34; 0003237.

### A. Primary Threats to the Joshua Tree's Continued Persistence

Primary threats to the Joshua tree's ability to recruit new generations and persist in their current range are climate change (e.g., increasing temperatures and prolonged drought), more frequent and severe wildfires, habitat loss from development, and herbivory. 0000067-151. These factors are often related and synergistic, and – in combination with the species' naturally low germination rates, slow growth and extremely limited dispersal capability – collectively threaten the Joshua tree's future viability. *Id.*

1.  **Climate Change**

Climate change is already driving substantial declines in species richness and diversity in desert ecosystems, with truly profound transformations for the Mojave on the horizon. *See e.g.,* 0011911-12; 0006432-589 (2013 Mojave Basin & Range Ecoregional Assessment). The region has already experienced significant warming over the second half of the 20th century. 0000086. According to California's Fourth Climate Change Assessment: Inlands Deserts Summary Report (Hopkins 2018), daily average high temperatures in the Mojave are projected to increase by 8–14oF by 2070–2100. 0012633, 12642. Annual rainfall rates are already low (averaging 5 inches per year) and highly variable from year to year. 0012644. Indeed, Esque questioned why the Service did not include drought in ranking *current* habitat quality given "we know that this is the worst drought in 1200 years going on right now." 0002749; *see also* 0000089 (acknowledging worst extended droughts in the Mojave all occurred in the last 30 years).

This variability is projected to increase over the coming decades, with extreme drought and extreme wet events both becoming more common. 0012633; 0000086; *see also* 0001244 (Cornett describing how the worst area flood wiped out large numbers of Joshua trees in Red Rock Canyon State Park). Increasing frequencies of these extreme events will in turn increase the risk of flash flooding ("atmospheric rivers") and wildfire, given the close relationship between precipitation variability and growth of invasive grasses that serve

as the major fuel for wildfire in the region. 0012633; 0000076, 0000081; 0007776-85
(regional climate summary describing same). The best available science shows that these
projected changes threaten the Joshua tree's continued existence.

Joshua trees already do not occur in the lowest, driest portions of the Mojave.
0000039. Studies indicate that warm season maximum temperatures and cold season
minimum temperatures constrain their distribution. *Id.*; 0007926 (Harrower 2018
explaining that Joshua trees "have the greatest reproductive success with a combination of
heat to stimulate seed germination and cold to support seedling establishment, but
temperature extremes in either direction may result in death"). Although these hardy
desert plants can survive high temperatures, drought decreases survivorship and
recruitment. 0000090. Conversely, extreme cold events also limit the distribution of
Joshua trees, but they need a cold season period to maximize growth. 0000060. Scientists
postulate that these climate variables likely explain why the species is restricted to the
Mojave's slightly cooler, mid-elevation zone. 0000034-48. And while *adult* Joshua trees still
occupy large, discontinuous areas within this elevational gradient,[2] studies show their
abundance is already declining likely due to drought, fire, and other climatic changes.
0000052, 0000111, 0000123.

---

[2] Updated demographic data from a recent USGS study using aerial imagery, which cannot
detect younger age classes, found adult Joshua trees occupy roughly 9.5 million acres—23%
less habitat than the Service previously reported in 2018. 0000046; 0007733.

Several researchers have detected little to no active recruitment of young Joshua trees across multiple study areas over the past three decades. For instance, Cornett reported substantial declines across the species' range at multiple sites he began monitoring in 1988. 0001243-44 (Cornett Pers. Comm.); 0006209 (2022 CDFW Status Review); 0001228-30 (Cornett 2019); 0012533-35 (Cornett 2014). For the western Joshua tree, this includes a 93%, 16%, and 73% decline at three study sites in JTNP and a 46% percent decline at Red Rock Canyon State Park. 0012534-35; 0001244 (stating over 90% of Joshua trees on three other study sites were destroyed by wildfire since 2000). For the eastern Joshua tree, approximately 23% of juvenile trees died due to the effects of drought and drought-exacerbated herbivory even at a higher elevation site in Cima Dome, Mojave National Preserve—an area presumed to be "climate refugia."[3] 0000089; *see also* 0003228 (observing a net cohort loss of 6.5% of Y. *jaegeriana* at Cima Dome); 0001244 (opining whether "even high altitude and northerly populations are at risk due to climate change"). Notably, this population decline at Cima Dome was reported even before the Dome Fire of August 2020 destroyed more Joshua trees than any wildfire in recorded history. 0003249 (Cornett 2022b). Esque also recently reported that nearly 95,000 acres of Joshua tree occupied

---

[3] Climate refugia are areas of habitat projected to be climatically suitable where *all* the Joshua trees' needs are forecasted to be met (e.g., appropriate conditions for seedling survival and sufficient recruitment to maintain population abundance). 0000014.

habitat was "lost and individuals within the habitat are presumed to have died as a result of drought within the last 20 to 40 years." 0000089.

Harrower (2018)'s results from JTNP "suggest that the range of Joshua trees is contracting at the lower elevations where there was no seedling recruitment and high tree mortality." 0007925. Harrower (2018) also notes that Joshua trees "do not seem to be moving successfully into higher elevations," potentially due to limitations on numbers of pollinating moths at these higher elevations. 0007928; 0007915 (confirming no moth abundance or sexual reproduction was observed at elevations less than 1,250m and greater than 1,500-1,600m); *see also* 0001171 (Smith also finding reduced reproduction at lower elevation sites characterized by hot and dry conditions). These findings are consistent with that of St. Clair (2018) who found Joshua tree stand density negatively correlated with increasing temperature. 0004488; 0000037.

Recent demographic data further supports the conclusion that high temperatures and drought stress at lower elevations are already limiting Joshua tree reproduction and seedling survival. *Id.*; 0000034. Joshua Tree National Park ("JTNP") officials recently confirmed "a clear and widespread decline in the density of Joshua trees in the park," where mortality is outpacing recruitment by more than double. 0000800-801 (Graver Pers. Comm.); 0007873-74 (Graver 2022); 0000052. These findings are consistent with other recent evidence of declines within *Y. brevifolia's* southern range from Sweet 2019 and

Barrows 2012. 0011346; 0004912; *see also* 0006412 (Cole 2011 stating "survey results show minimal to no recent Joshua tree recruitment within the southern Mojave Desert in recent years."); 0007736-39 (Esque 2010 demographic study of Joshua tree populations in five NPS units throughout the Mojave never detected a single seedling in 3 years of sampling).

Regardless of whether Joshua tree abundance is already declining, the Service acknowledges the current scientific consensus: Joshua tree abundance is expected to significantly decline in the foreseeable future as most areas will be devoid of new recruits to replace dying off older individuals. 0000090-93; 0002392-93, 0002661 (emails to peer-reviewers); 0001244 (Cornett stating he expects the rate of decline to dramatically increase in the next two to three decades "since most populations are composed of increasingly older individuals with virtually no population recruits in most areas."). As the Service notes, while each of the available bioclimatic models used different methods and input datasets, all nevertheless agree that 80–100% of the Joshua tree's current distribution will be climatically unsuitable by end-of-century (i.e., unable to meet the species' needs to regenerate and thus persist). 0000090-99; *see also* 0011342 (Sweet 2019 similarly addressing this modeling consensus).

Specifically, *every* peer-reviewed, published study to use species distribution modeling[4] predicts that even under optimistic "lower emissions" climate scenarios like RCP 4.5 and a projected 2–3°C increase in summer temperatures (3.6–5.4°F), approximately 66–98% of the Joshua tree's range will become climatically unsuitable between the next three to seven decades. 0000098.

| Study | Study Area | Species | Timeframe | Lower emissions scenario | Percent Decline in Modeled Habitat | High emissions scenario | Percent Decline in Modeled Habitat |
|---|---|---|---|---|---|---|---|
| Sweet *et al.* 2019 | JTNP + Mojave Land Trust to the north 5km | YUBR | 2070-2099 | RCP 4.5 | 81.41 | RCP 8.5 | 99.98 |
| Barrows and Murphy-Mariscal 2012 | JTNP and 10km buffer | YUBR | undefined | ~3.6° F (2° C); ~5.4° F (3° C) | 66-78; 90-98 | - | - |
| Thomas *et al.* 2012 | southwest, multiple species study | YUBR, YUJA combined | 2040-2069; 2070-2099 | B1; A1B | 88.6; 84.8 | A2 | 94.9 |
| Cole *et al.* 2011 | Range-wide | YUBR, YUJA combined | 2070-2099 | A1B | up to 90 | - | - |
| Dole *et al.* 2003 | Range-wide + 100km buffer | YUBR, YUJA combined | undefined | future climate with enhanced freezing tolerance | 71 | - | - |
| Shafer *et al.* 2001 | Range-wide (study addressed multiple species) | YUBR, YUJA combined | 2090-99 | IPCC IS92a | unquantified; >80 percent | - | - |

*Id.*

For instance, the modeling effort of Shafer (2001) shows an almost complete extirpation of *Y. brevifolia* from its current range by 2090–2099 under several future scenarios. 00010647-663 (Shafer 2001); 0006415-17 (Cole 2011 comparing results to Shafer 2001). Dole (2003) also modeled the future range for Joshua trees under doubled

---

[4] *See* 0011341 (Sweet 2019 describing the use of "species distribution models," also referred to as "ecological niche models"); 00000183-84 (Service using term "bioclimatic models").

carbon dioxide conditions, similarly finding that a considerable portion of the species current range will become climatically unfavorable by this timeframe. 0006999-70008.

Cole (2011) built a sophisticated model that differed from previous models in its use of specific presence/absence data points to define the Joshua tree's climate tolerances and the testing of models to simulate the current range of the species. 0006409-6421. All of the individual climate models, as well as an ensemble of 22 global circulation models based upon IPCC (2007) A1B "medium" emissions scenario (correlating with an estimated 2.8°C or 5°F global temperature increase, *see* 0011378) the authors utilized, project a severe (~90%) decline in climatically suitable habitat for Joshua trees by 2070–2099. 0006415.

12



0006416 (Cole 2011).

Thomas (2012)[5], a USGS report, stands out for having modeled future suitable habitat for a variety of desert plants in the U.S. Southwest, including Joshua trees (*Yucca brevifolia*), for both mid-century (2040-2069) and end-of-century (2070-2100) timeframes under three climate change scenarios as described by the 2007 IPPC report: B1 (a "low" emissions scenario with an estimated 4.3°F global temperature increase), A1B (a "medium" emissions scenario with an estimated 5°F increase), and A2 (a "high" emissions scenario with an estimated 6.12°F increase). 0011368-78; 0000098. All end-of-century projections under each climate scenario were consistent with Cole (2011), finding: an 88.6%, 84.8%, and 94.9% range-wide decline in climatically suitable habitat for Joshua trees by 2070-2099. 0011385; *see also* 0000184. What's more, mid-century projections also showed substantial declines in suitable habitat under all three scenarios, 72.3%, 75%, and 60.1%, by 2040-2069. 0011385. Overall, this USGS study identified the Joshua tree as among the desert plants most vulnerable to climate change-driven habitat loss. 0011387-89.

Barrows (2012) constructed a finer-scale model of *Y. brevifolia's* current distribution within and surrounding JTNP, and then assessed the sensitivity of the species to a gradient of climate change scenarios. 0004906-4914. Notably, the most severe climate scenario this study modeled (3°C increase in mean July maximum temperature) correlates to a lower

---

[5] Apparently, the Service chose not to rely upon Thomas 2022's study because "a large portion (-46 percent) of Joshua trees occupied habitat was modeled as *currently* climatically unfavorable according to their modeled baseline distribution." 0000185; 0001139.

emissions trajectory represented by the Service's Future Scenario 1, 0000121, yet still projects a 90–98% reduction in *Y. brevifolia's* current distribution within its namesake Park. 0004911-12; 000098.

Similar to Barrows (2012), Sweet (2019) sought to identify the existence and extent of potential climate refugia for *Y. brevifolia* within JTNP via distribution models validated with field data. 0011340-356. Sweet (2019) used Joshua tree presence points, a database of nine environmental variables, and end-of-century (2070–2099) greenhouse gas emissions under highly mitigated, moderately mitigated, and unmitigated scenarios. 0011344. Under highly mitigated and moderately mitigated emissions scenarios, only 18.6% and 13.9%, respectively, of current occupied *Y. brevifolia* habitat remained as refugia. 0011346. Under the unmitigated, "business-as-usual" emissions scenario, only 0.02% of *Y. brevifolia* habitat (a mere 37 acres) is projected to remain as refugia. 0011347. Sweet (2019) ascribed the difference in results from Barrows (2012), to finer scale habitat data, difference in climate scenarios used, and better and more dense information on Joshua tree presence. 0011352. Suggesting the more we learn about the Joshua trees, the bleaker their future appears.

A comprehensive ecological assessment of the Mojave ecoregion by the Bureau of Land Management (Comer 2013) also predicted "truly profound" transformations by 2060 based on similar modeling efforts. 0006577-80; 0006587-89 (recognizing a whole suite of climate-related impacts and noting, based on these forecasts, one might anticipate, e.g.,

"the expansion of sparse to completely unvegetated plains"). As the report further states, "undoubtedly considerable change in climate regime is indicated from these forecasts. In some cases, substantially more than 50% of the area of the current climate distribution is lost over the next 50 years." 0006578. Like the models from independent experts, BLM's models also forecast "[s]evere contraction in characteristic bioclimates for Mojave Mid-Elevation Mixed (Joshua tree-Blackbrush) Desert Scrub" as well as the "loss of Joshua Tree woodlands from their namesake Park." 0006578-80, 0006588-89.

Further, while modeled forecasts over future rainfall in the desert southwest vary, all similarly agree that extremes will become more frequent. 0000089-93; 0012635. Prolonged droughts (i.e. multiyear, with some persisting for a decade or more) are projected to occur with greater frequency and intensity. *Id.*; *see also* 0006880-85 (Cook 2015 revealing consistency among models for substantial risk of multidecadal drought in the Southwest during the second half of the 21st century). Studies show increasing drought stress will substantially reduce plant vigor, growth, survival and recruitment, in part by also leading to increased herbivory and predation from wildlife lacking alternative forage and moisture. *E.g.*, 0000087-90, 0000097-101.

Such drought is especially devastating for the survival of seedlings and young Joshua trees. *Id.*; 0007745 (Esque 2015). Again, researchers are already observing drought-exacerbated herbivory of young age-classes "range-wide." 0007733-34 (Esque 2022b);

16

0007740-47. New recruits also lack well-developed root systems that extend deeper into the soil profile where moisture is more reliable and soil temperature less extreme. 0009788. While adult trees may thus be able to tolerate longer drought cycles, seedlings cannot. 0000024, 0000066-67. Shifts in the timing of rainfall could also adversely affect germination and development. *See e.g.*, 0003228 (highlighting importance of summer rainfall and not simply looking at annual averages); 0000033. And even if the overall amount of annual precipitation does not decline much, rising temperatures mean the evaporation rate is much higher so less water reaches the desert floor to get soaked up by native plants. 0000087-90.

Whether or not the specialized yucca moths that Joshua trees exclusively rely upon for sexual reproduction will be able to keep pace with a changing climate is also a concern. 0000095. As noted, recent studies suggest that higher elevation, cooler climate sites that might serve as climate refugia for Joshua trees may be less suitable for their sole pollinators. 0007926-27. Cornett also warns "a new threat may be on the horizon: a pollinator and its host that may no longer be in perfect synchronization." 003236-39; 0001216-18. Climatic shifts may cause Joshua trees to start flowering earlier in the season before the moths emerge from the soil, missing the already brief pollination window and throwing this highly-specialized mutualistic relationship between the species out of sync. *Id.* This was the case with the unprecedented early blooming around JTNP in November of 2018, following

17

heavy October rains and warmer than usual temperatures, where no blossoms were pollinated. *Id*.; 0001218; 0000095.

Finally, although some models predict the creation of new climatically suitable habitat outside the species' current range in higher elevations as temperatures rise, the best available science indicates that the Joshua tree's ability to disperse and colonize such habitat is "extremely limited." 0006417. Cole (2011) reveals minimal actual northward range shift over the Holocene, corresponding to a migration rate of 2m (∼6.5 feet) a year over the last 11,700 years. *Id*.; 0000044 ("Joshua trees have limited capacity to disperse to and colonize new habitat where it has not previously occurred."). As Dole 2003 concludes, the Joshua tree "will migrate too slowly to fill potential new habitat, while much of its current range will become climatically unfavorable." 0007006.

## 2. Wildfire

More frequent and severe fire is another major threat to the Joshua tree's future viability. 0000073-86, 0000093-95, 0000120-121. Higher elevation areas in which the species are projected to best be able to survive hotter, drier conditions are at great risk of fire due to the prevalence of highly flammable invasive grasses. *Id*. Indeed, roughly half of the refugia within JTNP that Sweet (2019) mapped have already burned in recent decades. 0011351; *see also* 0004913 (Barrows 2012). While the 2020 Dome Fire destroyed approximately 10% of projected climate refugia in the Mojave National Preserve. 0000094.

Mojave ecosystems are not fire adapted. Historically, wildfires in the region were small and rare, with fire return intervals greater than 100 or more years. But several recent studies confirm that fire has significantly increased in both frequency and severity over the past few decades, in large part due to the proliferation of invasive grasses. 0000076-86. Current conditions form a feedback loop, wherein increased fire frequency and degree further promotes the invasion of annual grasses into previously uninvaded areas, with increased annual grass cover and abundance in turn leading to more extensive and severe wildfires. *See* 0000074, 0000079; 0007770 (Fusco 2019 finding invasive grasses have altered fire regimes region-wide, "increasing fire occurrence by up to 230% and fire frequency by up to 150%."); 0007980 (Holmgren 2009 positing "the increase in fire size and frequency could transform JTNP vegetation in a matter of decades."); 0006090-91 (describing fuels in the Mojave as "near the tipping point between a fire regime characterized by infrequent small fires and one of frequent large fires.").

Fires also tend to track the same heavy precipitation winters that are most suitable for Joshua tree seedling emergence, further threatening successful recruitment of new generations. 0007746; 0006995 (Defalco 2010 similarly finding that the Mojave's mid-elevation zone is highly susceptible to increased fire size following years of high cool season rainfall that allows for especially high production of invasive grasses); 0006077 (BLM report describing Southern Nevada Complex Fires).

19

As BLM's ecoregional assessment provides, even "trace" amounts of grass cover can carry fire across open spaces between shrubs, affecting vast amounts of the Mojave's mid-elevation shrublands where Joshua trees reside. 0006514-15. Tagestad (2016) observed that between 1976 and 2010 there were 227 fires in the Mojave Desert that collectively burned over 1.8 million acres, the vast majority of which were within Joshua tree habitat. 0011362.

Recent studies confirm that these higher intensity fires have resulted in significant, widespread mortality of Joshua trees. 0000081. DeFalco (2010) found that five years after a fire in JTNP, 80% of burned Joshua trees in the study area had died, with smaller trees (<1m tall) dying more rapidly. 0006991. Furthermore, 26% of *unburned* trees in the study area also died during the same period (1999-2004), with drought and increased herbivory likely contributing factors. *Id.* The high mortality recorded in this study is consistent with other recent findings, such as the 1.3 million eastern Joshua trees reported to have died from the massive 2020 Dome Fire that decimated roughly 43,000 acres of the Mojave National Preserve. 0000077; 0003252. Then in July 2023, the 93,000-acre York Fire killed nearly one million more Joshua trees in the eastern portion of the Preserve. Compl. ¶ 58.

Desert ecosystems recover very slowly post-fire, which may take "decades to centuries" depending on the climate conditions that follow. As the Service recognizes, such long recovery periods can drive the local extinction of "long-lived species with low reproductive output that are poor competitors" like Joshua trees. 0000080; 0000341-44.

The Service projects that high-severity burn areas and areas that burn repeatedly at lower intensities will be unable to support Joshua trees in the future. 0000343; *see also* 0006995 (Defalco 2010 explaining predicted changes to regional climate conditions "will continue to promote desert wildfires that injure and kill all size classes of *Y. brevifolia*."); *id.* (also noting "greater frequency of recruitment failure on postfire landscapes will be detrimental to aging *Y. brevifolia* populations in the future.").

A staggering 845,932 acres of Joshua tree habitat already burned between 1960 to 2020. 0000121. Burn areas followed by drought support little to no recruitment. 0006995; 0003253. All told, with other large fires in the past few years the amount of Joshua tree habitat lost or degraded by wildfire nears one million acres (roughly 10% of both species' ranges combined with *Y. jaegeriana's* northern population especially hard hit). 0000121. The Service's analysis of future scenarios predicts the amount of Joshua tree habitat to burn will double by century's end. 0000120; 0000136, 0000145 (projecting under Future Scenario II that approximately 18% of the limited refugia projected to remain is likely to be lost from wildfire).

### 3. Habitat Loss from Development

Joshua trees are also threatened by habitat loss and degradation from development and other human activities. While much Joshua tree habitat is within federally managed lands, many of those areas where management is most protective (e.g. national parks and

preserves) are where the impacts of climate change and wildfire may be most severe. *See supra*. Other areas of federal land are slated for large-scale energy projects that consume or degrade habitat. 0000066-68; 0011228-244 (Smith 2023).

Further, over half of the western Joshua tree's southern population is within private land, with little protection from development. 0000048. Nearly 1.5 million acres of *Y. brevifolia's* habitat is projected to be lost from urban development and large-scale renewable energy projects. 0000069-70, 0000118-19. Though most of this development will occur within areas projected to be climatically unsuitable for Joshua trees by century's end anyway, the Service expects some additional loss of modeled climate refugia. *Id.*; 0000091.

## II. Listing Petition and History

Guardians first petitioned the Service to list the Joshua tree as a "threatened" species in September 2015. 0012768-816. After some delay, the Service published its 2018 Species Status Assessment ("SSA"), 0011702-828, and issued its 12-Month Finding in August 2019, 84 Fed. Reg. 41,694-99. In its 2018 SSA, the Service disregarded the available studies employing species distribution modeling, i.e. the "bioclimatic models," as too "spurious" to forecast future habitat suitability for Joshua trees. 0011780. The Service also chose not to conduct its own habitat suitability modeling. Instead, it prepared a "qualitative evaluation" of the Joshua tree's viability during the end-of-century timeframe, which it considered the "foreseeable future," using a scenario planning framework. *Id.*; 0012510 (2019 Status

Review Form). Ultimately, the Service concluded that neither the individual or combined impacts of climate change, wildfire, and habitat loss from development were likely to impact Joshua trees at the population or species level and thus listing as threatened was not warranted. *See Guardians I*, 561 F.Supp.3d at 897-98.

The Service's failure to utilize the best available science, and its conclusions in broad contradiction thereof, prompted substantial criticism from peer- and partner-reviewers and formed the primary basis for Guardians' first lawsuit. *See e.g.*, 0011913-14 (quoting some of the critical comments on the 2018 SSA); *Guardians I*, 561 F.Supp.3d at 899-905. Judge Wright agreed with Guardians that the Service acted arbitrarily and capriciously, violating the ESA in multiple respects. *Id.*

III.   **The Service's 2023 Remanded Listing Decision**

Following the remand order, the Service prepared a revised SSA. 0000001-0000189. The Service again declined to conduct its own modeling of future Joshua tree distribution using the best available climate change data (e.g., the IPCC's RCP 4.5 and 8.5). This time, however, the Service expressly recognized the bioclimatic models as "the best available science" on the Joshua tree's response to future climate change and incorporated their combined results into the SSA's two "plausible" future scenarios. 0000096; 0002392-93, 0002661 (emails to peer-reviewers acknowledging "the overall consensus that much of Joshua trees current range will not be suitable at the end of the century."); 0002169,

0000570-571, 0002160 (similar correspondence regarding the Service's choice to incorporate the existing models rather than conduct its own). Like the prior SSA, the revised SSA also projects the Joshua tree's future viability under two future scenarios with a timeframe of 80 years, until the end of the century (2070–2099). 0000014; 0011776-789 (2018 SSA). The Service had reliable end-of-century projections for all key threats (climate change, altered fire regimes, and land use changes from development) from data based on the IPCC's RCP 4.5 and 8.5, with the exception of invasive grass cover. 0000014. For predicting future invasive grass cover, the Service used Comer 2013's model that forecasts mid-century conditions and then modeled a slight increase for the end-of-century timeframe. 0000118. The Service selected both RCP 4.5 and RCP 8.5 "because they provide a plausible range of future conditions considering the potential for both near-term mitigation (RCP 4.5) and continued increases in greenhouse gas emissions (RCP 8.5)." 0000014. RCP 4.5 estimates an approximate 5.4°F (3°C) global temperature increase and RCP 8.5 estimates an approximate 9°F (5°C) global temperature increase. *Id.*; 0000339. The Service states that these two future scenarios "provide a spectrum of the best available information regarding potential habitat loss and degradation." 0000014.

Under Future Scenario I—the best case scenario—only around 30% and 22% of the eastern and western Joshua tree's current range, respectively, is expected to remain as functional refugia by 2070-2099. *See* 00000124 (Table 8-5 showing forecasted refugia when

considering the combined impacts of all key threats). Under Future Scenario II, the Service predicted as little as 12% and 7% of the eastern and western Joshua tree's current range, respectively, will be able to support all the species' needs come century's end. *Id.*

Ultimately, the Service's rationale for its listing decision was largely the same as before: despite all the best available science, it is still too uncertain to reliably predict whether climate change, wildfire, and habitat loss from expanding development threaten the Joshua tree's future viability. 0000339-40, 0000354.

## STANDARD OF REVIEW

ESA claims are reviewed under the APA, 5 U.S.C. § 706 *et seq. Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Under the APA, courts shall hold unlawful and set aside agency action found to be "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While the APA standard is deferential, courts must nonetheless engage in a "thorough, probing, in-depth review." *Citizens of Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). Courts must disapprove an agency's action where its "reasoning is irrational, unclear, or not supported by the data it purports to interpret." *Nw. Coal. for Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008). A decision is arbitrary and capricious if the agency:

> [H]as relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that is could not be ascribed to a difference in view or the product of agency

25

expertise.

*Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

By misapplying key statutory terms and insisting on near scientific certainty, the Service raised the bar too high for Joshua trees to meet the ESA's definition of "threatened species" and thus warrant federal protections. As courts have explained, for an imperiled species to meet the statutory definition of "threatened," "it must only be likely to be in danger of extinction in the foreseeable future," not at "high risk" of extinction. *W. Watersheds Project v. Foss*, 2005 WL 2002473, *17 (D. Idaho 2005); 16 U.S.C. § 1532(20). "[T]he required danger level for extinction necessarily depends on the applicable scientific viability assessments for the particular species." *Trout Unlimited v. Lohn*, 645 F.Supp.2d 929, 948 (D. Or. 2007). For example, a one to five percent risk of extinction in 100 years can create a discernible risk of extinction. *Foss*, 2005 WL 2002473, *15. Likewise, the term "likely" in the definition of "threatened species" holds its ordinary meaning, as in more likely than not. *See e.g.*, 84 Fed. Reg. 45,020, at 45,021 (August 27, 2019) (the Service noting in its preamble to the 2019 ESA regulations that this is consistent with the agency's long-standing interpretation and previous judicial opinions); *see also In re Polar Bear*, 709 F.3d 1, 14-15 (D.C. Cir. 2013); *Pritzker*, 840 F.3d at 684.

Protecting threatened species – in addition to those already endangered – thus reflects the ESA's policy of "institutionalized caution," *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1030 (9th Cir. 2011), and "is in keeping with congressional intent" that the Service "take preventative measures *before* a species is 'conclusively' headed for extinction." *Defs. of Wildlife*, 958 F. Supp. at 679–80 (quoting legislative history); *Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 251 (D.D.C. 2002). Yet with respect to the Joshua tree, the Service once again reached a listing decision that defies the statute's overarching purpose as well as its "best available science" mandate.

## I. The Service's Listing Decision Runs Counter to the Best Available Science.

As the Ninth Circuit and several other courts have repeatedly affirmed, the ESA requires reliance on the best *available* science, not certainty. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014); *Building Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (Congress directed the Service to consider the best scientific information "'*available*,' not the best scientific data *possible*.'"). As such, the Service cannot simply point to uncertainty to deny Joshua trees protection under the ESA. *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1072-73 (9th Cir. 2018). Yet, that is just what the Service did here.

//

//

27

**A. The best available science shows Joshua trees are threatened by climate change.**

The Service's determination that climate change does not threaten the Joshua tree's future viability runs counter to the entire body of available climate science. *See supra* Background I.A.1. As discussed, *every* peer-reviewed, published study to model the Joshua tree's response to forecasted climatic changes, i.e., Shafer (2001), Dole (2003), Cole (2011), Thomas (2012), Barrows (2012), Comer (2013), and Sweet (2019), shows a widespread loss of suitable habitat even under optimistic, "lower" emissions scenarios like RCP 4.5 or B1 by century's end. *Id.*; 0000098 (forecasting 66–98% of currently suitable habitat will be lost under moderately mitigated future climate scenarios). Under higher emissions scenarios like A2 or RCP 8.5, models from Thomas (2012) and Sweet (2019) project nearly a complete loss of climatically suitable habitat by end-of-century. *Id.* Further, reports from the Service's own sister federal agencies (e.g., the BLM, USGS, and NPS) show that even by *mid*-century climate change will profoundly transform the Mojave Desert, with Joshua trees functionally extinct in the majority of their current range. *See e.g.*, 0011385 (Thomas 2012 forecasting a 72.3%, 75%, and 60.1% loss of climatically suitable habitat by 2040-2069 under all three modeled climate scenarios); 0006589 (Comer 2013).

Demographic data from multiple study sites throughout the Mojave over the past three decades are validating the results of the bioclimatic models. That is, studies finding little to no recruitment of young Joshua trees match areas that are already hotter and

drought-stricken, whereas data confirming the presence of young age-classes have proven to be a near exact match with areas of modeled climate refugia. *See supra* Background I.A.1; 0004907 (Barrows 2012); *see also* 0011340 (Sweet 2019 similarly finding "[r]ecruitment within stands shows a strong concordance with modeled climate refugia"). In other words, the climate and habitat variables that experts presume limit successful Joshua tree recruitment and thus future distribution, are matching the projections from the bioclimatic models. *See e.g.*, 0000058-65 (describing appropriate recruitment conditions).

Following *Guardians I*, the Service can no longer disregard this wealth of undisputed science indicating Joshua trees are threatened by climate change. 561 F.Supp.3d at 902. To the contrary, the Service now acknowledges "the overall consensus that much of Joshua trees current range will not be suitable at the end of the century." 0002392-93, 0002661. And expressly recognizes that the bioclimatic models are "the best available information on how climate change may affect Joshua trees' distribution in the future." 0000096. Accordingly, the Service chose to incorporate their combined results into the SSA's future scenarios rather than conduct its own habitat suitability modeling. *Id*. Simply put, the Service offers no countervailing evidence; its own record shows that Joshua trees are "*likely*" to become endangered within the next 30 to 70 years due to climate change—a timespan of just one generation for this long-lived species. *See* 16 U.S.C. § 1532(20) (defining "threatened species"). Because the Service's decision to the contrary is thus unsupported

and contradicted by the best available science it is arbitrary and violates the ESA. *Greater Yellowstone*, 665 F.3d at 1024 (holding the Service "failed to articulate a rational connection between the science it relied upon and its conclusion."); *State Farm*, 463 U.S. at 43.

**B. The best available science reveals the cumulative effects of climate change, wildfire, expanding development, naturally low germination rates, and an extremely limited dispersal capacity collectively threaten Joshua trees.**

The Service must list a species if "any one *or a combination*" of the five statutory listing factors causes it to be threatened or endangered. 50 C.F.R. § 424.11(c) (emphasis added). The cumulative impacts of all key stressors combined, along with the species' naturally low germination rates and extremely limited dispersal capacity, make the case for listing Joshua trees as threatened nearly "ironclad"—surpassing what the ESA requires. *Guardians I*, 561 F.Supp.3d at 899. Yet the Service continues acting arbitrarily by insisting on even more conclusive evidence, beyond what the best available science provides. *Id.*

As noted, the Service recognizes that wildfire is the second greatest threat to the Joshua tree's future viability, particularly as the species' range contracts in the face of climate change and the frequency and severity of fire increases throughout its habitat. *Supra* Background I.A.2. The SSA acknowledges that fire has already burned large swaths of Joshua tree habitat, is a significant source of Joshua tree mortality, creates conditions that delay or preclude recruitment of new Joshua trees, and is diminishing potential climate refugia. 0000076-86, 0000092. This negative trend is expected to continue throughout a

significant portion of the Joshua tree's range. 0000085-86; 0006090-91; 0004913; 0006514-15; 0006518 (Comer 2013 plainly stating that fire poses "a serious threat to *imperiled* species such as…Joshua tree.") (emphasis added). All told, the Service estimates that the amount of Joshua tree habitat that has already burned (roughly 1 million acres) will double by century's end, primarily impacting the miniscule amount of climatically suitable habitat expected to remain. 0000086.

The Service also identified urbanization and large-scale solar energy development as having the potential for "severe, localized effects," particularly for the western Joshua tree. 0000069-70. It projects around 1.5 million acres of *Y. brevifolia's* habitat will be lost to urban and renewable energy development within the next 70 years. 0000118-19.

The Joshua tree's naturally low germination rates, slow growth, long generation time (50 to 70 years), and limited dispersal capabilities also weigh heavily in favor of listing. *See* 16 U.S.C § 1533(a)(1)(E) (requiring Service to consider "other natural or manmade factors affecting [the species] continued existence."). Following *Guardians I*, the Service now admits it can no longer selectively rely on modeled forecasts of new areas of climatically suitable habitat outside the Joshua tree's current range to support its non-listing decision, given the species' "extremely limited" capacity to migrate and colonize such areas. *See* 561 F.Supp.3d at 901-02; *see also*, 0000092-93, 0000123.

31

In sum, the Joshua tree's natural recruitment challenges make the species all the more vulnerable to the combined impacts of climate change, wildfire, and habitat loss from development, all of which further illustrates the disconnect between the available evidence and the Service's "not warranted" listing determination. Its own forecasted estimates of the combined impacts of all key threats shows as little as roughly 7–22% of *Y. brevifolia's* range and 12–30% of *Y. jaegeriana's* range will remain as refugia to support all the species' needs by 2070-2099. 0000124. Because the Service's listing decision did not rationally draw from the best available science concerning the combined and cumulative impacts to Joshua trees, and instead "runs counter to the evidence before the agency," the decision is arbitrary and unlawful. *Greater Yellowstone*, 665 F.3d at 1024; *State Farm*, 463 U.S. at 43.

**C. The scientific evidence is sufficiently certain to support listing Joshua trees.**

Despite acknowledging the wealth of uncontroverted science, the Service concluded that Joshua trees are not threatened by climate change, or the combined impacts of all key stressors, because there is still too much "uncertainty in the timing and magnitude of the species' responses[.]" 0000339. The Service goes on to allege that "information about physiological thresholds for temperature and other physiological, phenotypic (change in form or shape), and genetic responses that may confer tolerance, local adaption, and adaptive capacity are unknown…" *Id*. It also insists that "the demographic data are not sufficiently reliable to provide an understanding of when Joshua tree individuals or

32

populations may begin to respond to the effects of climatically unfavorable conditions" and

"how long adult trees may persist in modeled climatically unfavorable conditions at the

end of century." *Id.* None of these arguments have merit.

Contrary to the Service's listing decision, the ESA does not require "absolute

scientific certainty" or knowing precisely how and when a species will respond to specific

threats. *See e.g., Defenders of Wildlife,* 958 F.Supp. at 679. "Even if the available scientific

and commercial data were quite inconclusive, [the Service] may—indeed must—still rely on

it..." *Sw. Ctr. for Biological Diversity v. Babbitt,* 215 F.3d 58, 60 (D.C. Cir. 2000). Scientific

findings are often necessarily made from "incomplete or imperfect information," *Brower v.

Evans,* 257 F. 3d 1058, 1070–71 (9th Cir. 2001), and the Service need not wait until it has

quantitative data reflecting the species decline, its population tipping point, or the exact

year in which harm will occur before taking protective action. *Alaska Oil and Gas Ass'n v.

Ross,* 722 Fed. Appx. 666, 668 (9th Cir. 2018). Imposing such a high standard would

deprive many species facing significant future threats from climate change – like Joshua

trees – from obtaining the protective "threatened" status they deserve, eroding the ESA's

"policy of institutionalized caution." *Greater Yellowstone,* 665 F.3d at 1030.

Indeed, this is precisely one of the reasons the Ninth Circuit and several other

federal courts have invalidated the Service's decisions to deny or remove ESA protections

for similarly imperiled species. In *Greater Yellowstone,* the Ninth Circuit determined that

the Service acted arbitrarily and capriciously in dismissing the impact of whitebark pine

declines in deciding to delist grizzly bears from the ESA because "the specific response of

grizzly bears to declines in whitebark cone production [was] . . . uncertain[.]" 665 F.3d at

1023. But like the record here, the Service there also had "considerable data—

demonstrating a relationship between pine seed shortages, increased bear mortality, and

decreased female reproductive success"—all pointing to adverse impacts. *Id.* at 1028-30.

Similarly, in *Zinke*, the Ninth Circuit held that the Service arbitrarily denied ESA

protections for the arctic grayling "[b]y failing to explain why the uncertainty of climate

change favors not listing the arctic grayling when [the agency's own finding] acknowledges

the warming of water temperatures and decreasing water flow because of global

warming[.]"900 F.3d at 1073. And in *Defenders of Wildlife v. Jewell*, the district court rejected

the Service's claim that it needed greater certainty and refinement in the climate change

data before listing the wolverine. 176 F. Supp.3d at 1003-05 (finding "the Service's stance

here borders on the absurd…").

Here, the Service's own record is similarly replete with considerable data connecting

specific climate parameters with the Joshua tree's ability to reproduce, survive the highly

vulnerable early life stages, and successfully recruit new generations. *Supra* Background

I.A.1. The growing body of demographic data is validating the modeled projections for

how and when the Joshua tree is likely to respond to rising temperatures and extended

droughts. *Id.* And the Service itself recognizes the multiple bioclimatic models as the best available science on the Joshua tree's response to climate change—acknowledging the "overall consensus" that Joshua trees will be rendered functionally extinct in roughly 80-99% of their current range by century's end. 0002392-93, 0002661. The Service also has "considerable data" on the Joshua tree's overwhelmingly negative response to wildfire, both on the plants themselves and their habitat (e.g., taking decades to centuries to recover and potentially driving local extinctions). *Supra* Background I.A.2. And it has reliable estimates on how much additional habitat is expected to be lost from urban and energy development within the next 70 years. Background I.A.3. Insisting on more definitive information about the Joshua tree's "physiological thresholds" and the "timing and magnitude" of its response to these leading threats is thus irrational and demands more than the best available science provides and the ESA requires.

The Service also improperly *favors* scientific uncertainty and speculation when it comes to the Joshua tree's "unknown" adaptive capacity, e.g., suggesting Joshua trees might be able to "change in form or shape" or possess "genetic responses" to withstand the massive habitat transformation forecasted to occur in less than one generation's timespan. 0000339. But the wealth of *available* science indicates Joshua trees are unlikely to: (1) rapidly adapt in situ to forecasted climatic changes over the next 30-70 years in order to "persist in place," or (2) disperse and colonize new climatically suitable habitat outside their

35

current range in order to "shift in space." *See e.g.*, 0000112 (SSA acknowledging Joshua trees' long lifespan, limited reproductive events, long generation time, extended age of sexual maturity, obligate mutualism with the yucca moth, and limited dispersal capabilities limit its ability to "persist in place" or "shift in space" in response to rapid climate change); 0011458-65 (Thurman 2020 describing these two classes of adaptive responses). Simply put, the Service's listing decision dismisses the raft of studies indicating Joshua trees are threatened by the widespread loss of climatically suitable habitat due to purported uncertainties, yet relies on a series of highly speculative "unknowns" to support its "not warranted" determination. 0000339. Such "unacknowledged and unexplained inconsistency is the hallmark of arbitrary and capricious decision-making." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 109 (D.D.C. 2018); *see also, e.g., Guardians I*, 561 F.Supp.3d at 900-01 (similarly rejecting the Service's "selective reliance" on portions of the modeling studies it believed supported its "not warranted" listing decision, while disregarding their contrary findings); *Ctr. for Biological Diversity v. Fish & Wildlife Serv.*, 342 F. Supp.3d 968, 978 (N.D. Cal. 2018) (rejecting reliance on inconclusive data "as proof of population stability").

Relying on uncertainty regarding "how long adult trees may persist in modeled climatically unfavorable conditions" is even more irrational. 0000339. For one, as Smith (2018) explained in his peer-review comments to the Service's prior SSA, the current distribution of Joshua trees includes individuals that are over a hundred years old, and that

became established before climate change impacts were realized. 0012602-03 (CESA petition quoting Smith 2018). Moreover, "it is well established that long-lived trees can persist as relict stands of moribund adults that exist outside the range of suitable habitats required for long term population persistence." 0012603. Several other experts similarly explain that for long-lived plants like Joshua trees, the range of conditions suitable for seedling survival and recruitment are often narrower than what adult trees can tolerate, thus future viability depends on the species' climate niche for successful recruitment. *See e.g.*, 0009743 -52 (Qui 2021); 0007746 (Esque 2015); 0011342 (Sweet 2019).

The ESA is "concerned with protecting the future of the species, not merely the preservation of existing [members of that species]." *Pritzker*, 840 F.3d at 683. Adult occupancy does not demonstrate the species' future viability, but rather a lag time to extinction because individual adults can still occupy areas that are no longer climatically suitable for recruitment, i.e., where Joshua trees are "functionally extinct." *See e.g.*, 0002393; 0002661. As Cronk (2016) more somberly writes, still standing adult trees in this "extinction waiting room" are "the living dead." 0012536.

## II. The Service's "foreseeable future" timeframe is arbitrary and contrary to the ESA.

Under the ESA, the Service must list a species as "threatened" if it "is likely to become an endangered species within the foreseeable future…" 16 U.S.C. § 1532(20). The term "foreseeable future" is not defined in the ESA so the Service relies on a 2009

Solicitor's Opinion (M-Opinion 37021) for guidance. *See* Exhibit A. The M-Opinion explains that the foreseeable future is the timeframe over which the best available science allows the Service to make reliable predictions. *See Pritzker*, 840 F. 3d at 681–682; Exhibit A at48, 52, 56, 57. A reliable prediction is not a statistical requirement and it need not be quantitative in nature. *Id.* at 684. Nor does it require certainty. Rather, a reliable prediction is one that is grounded in the best available science and "reasonable to depend on it in making decisions." Exhibit A at 48. These predictions can be in the form of extrapolation of population or threat trends or an assessment of how future threats will affect a species. *Id.* at 1. Such predictions are reasonable if they are "grounded in data and logic" as opposed to blind speculation. *Id.* at 8.

In 2019, the Service adopted new regulations defining the term "foreseeable future." 84 Fed. Reg. 45,020 (August 27, 2019). The Service insists the new regulations are consistent with the 2009 M-Opinion. *Id.* at 45,028; *see also*, 0000339 (listing decision explaining: "'Reliable' does not mean 'certain'; it means sufficient to provide a reasonable degree of confidence in the prediction."). Under the new regulations, however, the foreseeable future only extends so far as the Service can reasonably determine the future threats to the species *and* the species responses to those threats. 50 C.F.R. § 424.11(d).

An agency determines the timeframe for its "foreseeable future" analysis on a case-by-case basis relying upon the best available science for a particular species and its habitat. *Ctr.*

38

*for Biological Diversity v. Haaland*, 998 F.3d 1061, 1063 (9th Cir. 2021). In this case, the Service's final listing decision arbitrarily limited the foreseeable future timeframe for assessing the Joshua tree's future viability to just 17-47 years out for several reasons.

First, shortening the foreseeable future timeframe to 2040-2069 is contrary to the plain meaning of the ESA in view of the best available science. When Congress provides no statutory definition, the Court will "'follow the common practice of consulting dictionary definitions to clarify their ordinary meaning' and look to how the terms were defined 'at the time the statute was adopted.'" *United States v. TRW Rifle*, 447 F.3d 686, 689 (9th Cir. 2006). An unabridged dictionary published nearly concurrently with the ESA's passage defined "foreseeable" as "lying within the range for which forecasts are possible." Webster's Third New International Dictionary at 890 (1971); *see also* Exhibit A at 54-55. In other words, the foreseeable future is defined by the range of time for which projections regarding threats to Joshua trees are *possible*. *Id.*

Here, the Service itself demonstrates that projections regarding key threats to Joshua trees, as well as the species likely responses to those threats, are indeed *possible* for 2070-2099, given that is the timeframe it selected for its own future scenarios analyses. 0000116-151 (2023 SSA); 0011776 (2018 SSA). CDFW also considered 2100 to be the foreseeable future for determining whether to list *Y. brevifolia* under CESA. 0006166 (CDFW 2022

Status Review). Reliable end-of-century projections for key threats to Joshua trees are thus *possible*.

Second, limiting the foreseeable future to 2040-2069 conflicts with the ESA's mandate to base listing decisions on the best *available* science. Again, the Service's own future scenarios analysis is based on reliable data that enabled it to make end-of-century projections for all key threats to Joshua trees. *See supra* Background I.A.1-3. Nearly all the bioclimatic models the Service considered in the 2023 SSA forecast the Joshua tree's response to climate change by 2100 and are based on the IPCC's future emissions scenarios for that end-of-century timeframe. 0000098. Projections for future land use changes and altered fire regimes are also based on the IPCC's data under RCP 4.5 and RCP 8.5 for the end-of-century timeframe. 0000014. The IPCC's climate scenarios are generally considered the best science on this topic and have been upheld by the Ninth Circuit as a valid basis for making listing decisions. *See Pritzker*, 840 F.3d at 679; *Ross*, 722 Fed. Appx. at 668; *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 558-59 (9th Cir. 2016).

Second, the fact that the Service admittedly relies "on the same assumptions about the extent and magnitude of threats projected over time in Scenarios I and II of the SSA report [i.e., going out 80 years]" as it does for its shortened listing decision timeframe, 0000339, further suggests that the modeling results have no more uncertainty for the 2070-2099 timeframe as for mid-century. Indeed, Thomas 2012's modeling results for 2050

track the same trajectory as the end-of-century projections and still show the vast majority of the species' range will be climatically unsuitable by 2040-2069, in accord with Comer 2013's mid-century projections using the IPCC's A2 climate scenario. 0011385 (Thomas 2012); 0003117 (Comer Range Forecast); 0006661 (Comer 2013).

Third, the Service expressly recognized the end-of-century timeframe (80 years) as the "foreseeable future" for its 2019 Joshua tree listing decision, *see* 0012510, and then failed to acknowledge and rationally explain its change in position for the 2023 listing decision. The APA mandates that when an agency changes its position, it cannot discard prior findings without a reasoned explanation, which "would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio...*" *F.C.C. v. Fox Television Studios Inc.*, 556 U.S. 502, 515 (2009).

In *Ctr. for Biological Diversity v. Haaland*, the Ninth Circuit recently applied this principle from *Fox* in holding the Service acted arbitrarily in deciding not to list the Pacific walrus as threatened. 998 F.3d at 1068. The Service similarly claimed as it does here that it could not reliably predict the effects of climate change on the walrus—mainly from the loss of sea-ice—beyond 2060, despite expressly finding in its prior 2011 listing decision that "it could reliably predict the extent of sea-ice loss in the Arctic through 2100." *Id. at* 1070.

Here the Service previously explained that selecting 2100 as the "foreseeable future" was both reliable and necessary for determining the Joshua tree's future viability given the

species has a "long life span (-200 years) and long time to sexual maturity (up to 30 years)."

0011776 (2018 SSA).  Anything less than at least one full generation (likely between 50-70

years) would be insufficient to evaluate how stressors "may affect vital rates, such as

seedling establishment and survival or adult survival, which relate to population stability or

growth and thus future resiliency." *Id*. The Service's failure to even acknowledge a change

in position on what it considers the "foreseeable future" timeframe for Joshua trees, let

alone provide an adequate explanation for departing from its prior position, thus renders

its 2023 listing decision arbitrary for this reason as well. "Simply reiterating generic

uncertainty that was known at the time of the prior finding does not meet the agency's

burden to explain its change in position." *Haaland*, 998 F.3d at 1070.

Last, departing from its prior well-reasoned explanation for selecting 2100 as the

foreseeable future for Joshua trees is all the more arbitrary in this case given the species

long lifespan and long generation time of 50 to 70 years. The Service recognizes that in

order to understand future extinction risk for such long-lived species with long generation

times that it needs to examine the effects of stressors *at least* one generation into the future.

*See*, 0011776 (2018 SSA); 000090 (2023 SSA stating: "The time period necessary to

evaluate successful recruitment and species persistence should be consistent with the

generation time of the species which is 50 to 70 years."); 87 Fed. Reg. 76,882, 76,884,

76,910 (Dec. 15, 2022) (Final Rule defining the foreseeable future timeframe for listing the

whitebark pine as 80 years from the present because the full range of possible generation times for this tree is 40 to 80 years). As the Service explained in its whitebark pine listing decision, "considering effects of stressors over at least one generation allows us to capture the effects of these stressors on reproduction (i.e., it allows us to discuss whether sufficient reproduction can occur in the future to replace trees lost to various stressors)." *Id*. The Service thus unreasonably departed from its position of assessing future threats over a timespan that represents at least one generation for the species.

### III.    The Service arbitrarily determined that Joshua trees are not threatened throughout any significant portions of their range.

The ESA defines a species as "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). Though the ESA does not define "significant portion of its range" the Ninth Circuit has held that if a species is "expected to survive" in an area that is much smaller than its historic range, the Service must "develop some rational explanation for why the lost and threatened portions of a species' range are insignificant before deciding not to designate the species for protection." *Zinke*, 900 F.3d at 1064. The Service once again failed to do so here. *See Guardians I*, 561 F.Supp.3d at 904.

The Service failed to rationally explain why its own forecasted habitat loss under either of its future scenarios for the end-of-century timeframe (2070-2100), *see* 0000124, or by its shortened mid-century timeframe (2040–2069), *see* 0000355-56, does not qualify

43

Joshua trees as threatened in a "significant portion" of their range. The listing decision states that approximately 66–88.6% of *Yucca brevifolia's* range is projected to be climatically unsuitable between 2040–2069, but then summarily concludes that this "large decline in climatically favorable habitat" does not necessarily result in the "immediate loss of occupied habitat" because of "uncertainties in the species' response." 0000355; *see also* 0000356 (similar explanation for *Y. jaegeriana*). This explanation again fails because the Service is arbitrarily relying on the ability of mature trees to still "occupy" habitat that is no longer conducive for reproduction, seedling survival and recruitment—i.e., where Joshua trees can no longer persist as a species and are "functionally extinct." *Supra* Argument I.C; *see also* 0011342 (Sweet 2019 explaining persistence "depends on where and when species reproduce, recruit, and establish on a landscape."). This violates the ESA.

## CONCLUSION

For the foregoing reasons, Guardians asks this Court to grant its summary judgment motion, set aside the Service's finding that Joshua trees do not warrant listing under the ESA, and order the agency to prepare a new finding that is based "solely on the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

Dated this **3rd** day of October, 2024.        Respectfully submitted,

*/s/ Jennifer Schwartz*

44

JENNIFER R. SCHWARTZ

WildEarth Guardians
P.O. Box 40490
Portland, OR 97240
Telephone: (503) 780-8281
Email: jschwartz@wildearthguardians.org
*Lead Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for WildEarth Guardians, certifies that this brief contains 9,985 words, which complies with the word limit set by the Court order dated September 26, 2024.


_/s/ Jennifer Schwartz_

Jennifer R. Schwartz

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will be served upon counsel of record through the Court's CM/ECF System.


/s/ Jennifer Schwartz

Jennifer R. Schwartz