NOSSAMAN LLP
PAUL S. WEILAND (SBN 237058)
pweiland@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone: 949.833.7800
Facsimile: 949.833.7878

*Attorneys for Proposed Amicus Curiae*
*QuadState Local Governments Authority*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| WILDEARTH GUARDIANS, | Case No: 2:24-cv-02281-WLH-RAO |
|---|---|
| Plaintiff, | **[PROPOSED] BRIEF OF AMICUS CURIAE QUADSTATE LOCAL GOVERNMENTS AUTHORITY** |
| vs. | |
| UNITED STATES FISH AND WILDLIFE SERVICE, and DEB HAALAND, in her official capacity as U.S. Secretary of the Interior, | Hearing:<br>Date: April 11, 2025<br>Time: 1:30 p.m.<br>Courtroom: 9B<br>Hon. Wesley L. Hsu |
| Defendants. | |

////

////

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ....................................................................................... i

TABLE OF AUTHORITIES ................................................................................ ii

I. INTRODUCTION ...................................................................................... 1

II. INTEREST OF AMICUS CURIAE ........................................................... 1

III. U.S. FISH AND WILDLIFE SERVICE CORRECTLY DECLINED TO APPLY THE PRECAUTIONARY PRINCIPLE IN ITS REVIEW OF THE JOSHUA TREE ............................................................................. 3

IV. JOSHUA TREE IS NOT LIKELY TO BECOME AN ENDANGERED SPECIES IN THE "FORESEEABLE FUTURE" ....................................... 6

V. EXISTING CONSERVATION FOR JOSHUA TREE FURTHER SUPPORTS SERVICE DECISION NOT TO LIST .................................. 11

VI. CONCLUSION ......................................................................................... 12

CERTIFICATE OF COMPLIANCE .................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Arizona Cattle Growers Ass'n v. U.S. Fish and Wildlife Service*,
   273 F. 3d 1229 (9th Cir. 2001) ........................................................................... 10

*Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*,
   462 U.S. 87 (1983) ............................................................................................. 10

*Bennet v. Spear*,
   520 U.S. 154 (1997) ............................................................................................. 4

*Center for Biological Diversity v. Lubchenco*,
   758 F. Supp. 2d 945 (N.D. Cal. 2010) ................................................................. 4

*Maine Lobstermen's Association v. National Marine Fisheries Service*,
   70 F.4th 582 (D.C. Cir. 2023) ...................................................................... 3, 4, 5

*Northwest Ecosystem All. v. U.S. Fish and Wildlife Serv.*,
   475 F.3d 1136 (9th Cir. 2007) ........................................................................... 10

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................................................. 10

*Trout Unlimited v. Lohn*,
   645 F. Supp. 2d 929 (D. Or. 2007) ...................................................................... 4

*WildEarth Guardians v. Haaland*,
   561 F. Supp. 3d 890 (C.D. Cal. 2021) ................................................................. 2

**Federal Statutes**

16 U.S.C.
   §§ 1531-1544 ....................................................................................................... 1
   § 1532(20) ...................................................................................................... 6, 10
   § 1533(a)(1) .................................................................................................. 3, 6, 7
   § 1533(b)(1) ......................................................................................................... 3
   § 1536(a)(2) ......................................................................................................... 2

**California Statutes**

Cal. Fish & Game Code
    § 11.5 (2023) .................................................................................................. 11, 12
    § 2020, et seq. ..................................................................................................... 11

**Other Authorities**

50 C.F.R. § 424.11(d) (2019) ........................................................................................ 6

Dep't of the Interior, Solicitor's Memorandum (2009),
    https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads
    /M-37021.pdf .................................................................................................... 6, 7

## I. INTRODUCTION

QuadState Local Governments Authority ("QuadState") appears as Amicus Curiae to (i) support the U.S. Fish and Wildlife Service's ("Service") determination that listing *Yucca brevifolia* and *Yucca jaegeriana* (collectively, "Joshua tree")[1] under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, is not warranted at this time, and (ii) advocate that the implementation of the ESA be based upon the best available scientific information.

## II. INTEREST OF AMICUS CURIAE

QuadState is a joint exercise of powers authority with seven members (six counties and one municipality) across three western states in an area within the Mojave and Sonoran desert ecosystems. Joshua trees are found within all but one of QuadState's member jurisdictions. FWS_046-48.

QuadState was founded in 1999 to address land management and conservation in light of the needs of species endemic to the desert ecosystem. QuadState is governed by a Board of Directors, who themselves are elected officials representing each member's jurisdictions. Board members are designated by their respective boards of county commissioners or boards of supervisors.

QuadState is regularly involved in issues relating to natural resources management and balancing multiple uses of federal public lands in the region. In this regard, QuadState provides technical assistance regarding habitat conservation

---

[1] The petition to list the Joshua tree submitted by WildEarth Guardians, Petition to List the Joshua tree (*Yucca brevifolia*) under the Endangered Species Act ("Petition") and giving rise to this action requested the Service list the Joshua tree either as a single species (*Yucca brevifolia*) or as two distinct sub-species: *Yuca brevifolia* and *Yucca jaegeriana*. FWS_12770. In its original 12-month finding regarding the Petition, Findings on Petitions to List Eight Species as Endangered or Threatened Species dated September 14, 2016 ("Original 12-month Finding"), the Service indicated that research has shown the Joshua tree is, in fact, two distinct species: *Yucca brevifolia ("Y. brevifolia")* and *Yucca jaegeriana ("Y. jaegeriana")*. FWS_11671. In both the Original 12-month Finding and the 12-month finding at issue in the present litigation, FWS_249-342, the Service often referred to the species in the collective. *Id*. For purposes of this brief, QuadState uses the term "Joshua tree" to refer to both species, unless otherwise noted.

plans, participates in a variety of regional interagency forums to ensure local government views are addressed by state and federal land and wildlife management agencies, and provides input to such agencies in connection with listing and other decisions. QuadState has participated in previous litigation over the listing status of the Joshua tree as amicus curiae. *WildEarth Guardians v. Haaland*, 561 F. Supp. 3d 890 (C.D. Cal. 2021).

Listing the Joshua tree would have significant consequences for QuadState and its members, including increased requirements for County and municipal projects to undergo time- and resource-consuming consultation under section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), potential requirement to implement expensive minimization and mitigation measures for county and municipal projects, and being potentially subject to third party litigation where one or more entities disagree with how QuadState members have addressed a given project's impact to the species. This is particularly troublesome given a substantial share of land within the jurisdiction of QuadState members is federally owned or managed.  Additional information on the interest of QuadState in this litigation and in the Joshua tree may be found in QuadState's Motion for Leave to File Brief of Amicus Curiae.

QuadState seeks to participate as Amicus Curiae in this action in order to add its unique perspective in supporting the Service's decision not to list the Joshua tree as threatened due to climate change in response to a "Petition to List the Joshua Tree (*Yucca brevifolia*) as Threatened under the Endangered Species Act" ("Petition") submitted by WildEarth Guardians ("Guardians").  FWS_249-332.

QuadState supports the positions of the Service set forth in Federal Defendants' Combined Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Federal Defendants' Motion"). Fed. Def.'s Combined Resp. to Pl.'s Mot. Summ. J. and Cross-Mot. for Summ. J., ECF No. 27. Specifically, the Service correctly determined that the best available scientific information regarding the Joshua tree indicates that the species is not at risk of

becoming endangered in the foreseeable future. In addition, it is significant that there are no population trend data for the species and that the lack of data, in fact, weighs in favor of not listing. In short, the Service correctly determined that the best available data does not indicate the Joshua tree warrants listing under the ESA at this time.

### III. U.S. FISH AND WILDLIFE SERVICE CORRECTLY DECLINED TO APPLY THE PRECAUTIONARY PRINCIPLE IN ITS REVIEW OF THE JOSHUA TREE

It is the Service's statutory responsibility to make listing determinations on the basis of the best scientific and commercial data available, and to apply the listing factors set forth by ESA section 4 when determining whether the Joshua tree meets the definition of a threatened species. 16 U.S.C. § 1533(a)(1), (b)(1). Unlike the Service, Plaintiff is "not governed by the specific statutory language of the ESA" and has reached its own conclusion that the species is threatened. While Plaintiff is unencumbered by the confines of law, regulation, and policy when making its determination as to the status of the Joshua tree, the Service is bound to act within its authority and did so in its 12-month Finding.

Plaintiff argues in its Motion for Summary Judgment and Supporting Memorandum ("Plaintiff's Motion") that for various reasons the Service erred in its determination that the Joshua tree does not meet the definition of "threatened species." Pl.'s Mot. Summ. J., ECF No. 24 at 1, 5-18. However, a careful reading of Plaintiff's Motion demonstrates that, in dealing with the future trajectory of the Joshua tree, Plaintiff would have the Service resolve every source of uncertainty by making worst-case assumptions in favor of listing the species rather than spend additional time resolving this uncertainty through accepted scientific techniques. This approach was recently rejected by the U.S. Court of Appeals for the D.C. Circuit in *Maine Lobstermen's Association v. National Marine Fisheries Service ("Maine Lobstermen's")*, in which that court explained that where "the ESA and its

1 implementing regulations call for an empirical judgment about what is likely…[t]he
2 Service's role as an expert is undermined, not furthered, when it distorts that
3 scientific judgment by indulging in worst-case scenarios and pessimistic
4 assumptions to benefit a favored side." 70 F.4th 582, 586 (D.C. Cir. 2023); *see also*
5 *Bennet v. Spear*, 520 U.S. 154, 176 (1997) (noting that "[t]he obvious purpose of the
6 requirement that each agency 'use the best scientific and commercial data available'
7 is to ensure that the ESA not be implemented haphazardly, on the basis of
8 speculation or surmise."); *Center for Biological Diversity v. Lubchenco*, 758 F.
9 Supp. 2d 945, 955 (N.D. Cal. 2010) (noting that the ESA does not require an agency
10 to give the benefit of the doubt to the species where data is uncertain or
11 inconclusive); *Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929, 947 (D. Or. 2007)
12 (finding that ESA section 4 does not require an agency give the benefit of the doubt
13 to species in listing decision). Both the 12-month Finding and the *Species Status*
14 *Assessment Report for Joshua Trees (Yucca brevifolia and Yucca jaegeriana)*
15 ("SSA") make clear that the Service lacks critical information about the basic life
16 history, population trends, and current status of the species.

17 For example, the 12-month Finding states that the Service "currently lack(s)
18 a population viability analysis and information on the abundance at each age class
19 required to maintain resiliency." FWS_260. The SSA notes there has been no
20 "systematic, range-wide survey of the abundance or density" of the Joshua tree "to
21 evaluate changes in abundance or density between historical and current conditions."
22 FWS_051. While the agency acknowledges that it has site-specific data for two
23 parks (Joshua Tree National Park and Red Rock Canyon State Park) indicating a
24 decline in population in some areas, the Service also indicates that there are no
25 similar monitoring data across the species' range and, as such, it is unclear whether
26 "this data is indicative of a potential trend or natural variability in survival and
27 recruitment. FWS_052. The Service further states in the SSA that it faces
28 "significant obstacles" in evaluating Joshua tree viability and the likelihood the

species will "persist for the next 80 years," including the lack of "range-wide demographic data and an understanding of the amount and frequency of recruitment required to maintain population abundance given the species long life-span." FWS_144. The degree to which the species is viable "depends on how resilient the populations are, which is based in large part on their range-wide abundance and recruitment; values [the Service] cannot currently estimate." *Id*.

At the same time the agency lacks sufficient demographic data, it also faces "uncertainty in magnitude and timing of future temperature increases and drought stress" and a "lack [of] information on the population dynamics of and environmental thresholds for the yucca moth", which is critical to Joshua tree reproduction. *Id*. Because there is "uncertainty in magnitude and timing of future temperature increases and drought stress" the Service explains it "is unclear when Joshua trees will begin to experience declines in survival and recruitment in response to unfavorable climate conditions." *Id*.

The SSA acknowledges there likely will be some degree of response to these conditions by the species by the end of this century and recognizes that "there is more uncertainty the further into the future [it] project[s]; therefore, the timing and magnitude of those response are difficult to forecast at this time." FWS_096 Importantly, the agency stated that "[i]t is not clear how and when Joshua tree individuals or populations may begin to respond to the effects of climactically unfavorable conditions, including when recruitment may be reduced, how long adult trees may persist in climatically unfavorable conditions, and if there are physiological thresholds." *Id*.

In sum, the best scientific data available do not establish that the Joshua tree is endangered or likely to become endangered in the foreseeable future. In such a circumstance, the agency must not "indulge in worst-case scenarios and pessimistic assumptions." *Maine Lobstermen's*, 70 F.4th at 595. The Service has appropriately applied best available scientific and commercial data to determine that it lacks

sufficient data to determine that the Joshua tree is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. See 16 U.S.C. § 1532(20).

## IV. JOSHUA TREE IS NOT LIKELY TO BECOME AN ENDANGERED SPECIES IN THE "FORESEEABLE FUTURE"

QuadState refers the Court to the Background section of Federal Defendants' Motion for a recitation of the statutory framework applicable to the Service's determination of whether a species should be listed as a threatened species under the ESA. Fed. Def.'s Combined Resp. to Pl.'s Mot. Summ. J. and Cross-Mot. for Summ. J., ECF No. 27 at 4-5. In this section, QuadState provides the Court information specifically concerning the phrase "foreseeable future" as that phrase applies to listing a species as threatened under the ESA.

The Complaint and Petition identify climate change as the primary threat to the Joshua tree in the foreseeable future. Pl.'s Mot. Summ. J., ECF No. 24 at 1, 5-18; FWS_12770. At the time the Service issued its 12-month Finding, applicable regulations instructed that the "foreseeable future" extended "only so far into the future as the Service[] can reasonably determine that both the future threats and the species' responses to those threats are likely." 50 C.F.R. § 424.11(d) (2019). The Service was not required by those regulations to identify the foreseeable future in "terms of a specific time" and was to use "the best available data…taking into account considerations such as the species' life-history characteristics, threat-projection timeframes, and environmental variability." *Id*. That definition had its basis in Department of the Interior Solicitor's Opinion M-37021, dated January 16, 2009, in which the Solicitor provided guidance on how the Service should apply the concept of "foreseeable future" in the context of listing decisions under ESA section 4 ("Solicitor's Memorandum").[2] The Solicitor's Memorandum explained

---

[2] Dep't of the Interior, Solicitor's Memorandum (2009), https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-37021.pdf.

1  that, with respect to listing species under the ESA, "Congress intended the term
2  'foreseeable future' to describe the extent to which the [Service] can reasonably rely
3  on predictions about the future in making determinations about the future
4  conservation status of the species." Solicitor's Memorandum at 1. The Solicitor's
5  Memorandum goes on to explain:

> The [Service's] analysis of what constitutes the foreseeable future for a particular listing determination must be rooted in the best available data that allow predictions into the future, ***and the foreseeable future extends only so far as those predictions are reliable***. "Reliable" does not mean "certain"; it means sufficient to provide a reasonable degree of confidence in the prediction, in light of the conservation purposes of the [ESA].
>
> Because the predictions relate to the status of the species, ***the data relevant to an analysis of the foreseeable future are those that concern the future population trends and threats to the species, and the likely consequences of those threats and trends***.

17  *Id*. at 13-14 (emphasis added).  Importantly, the Solicitor's Memorandum explains
18  that just because groups, "not governed by the specific statutory language of the
19  ESA, reach conclusions concerning their definition of 'threatened' based on the use
20  of standards of their own choosing, does not provide a basis for the [Service] to rely
21  on such conclusions in complying with the terms of the statute." *Id*. at 15.
22      It is the Service's statutory responsibility to make listing determinations on
23  the basis of the best scientific and commercial data available, and to apply the listing
24  factors set forth by ESA section 4, 16 U.S.C. § 1533(a)(1), when determining
25  whether the Joshua tree meets the definition of a threatened species. Unlike the
26  Service, the Plaintiff is "not governed by the specific statutory language of the ESA"
27  and has reached its own conclusion that the species is threatened. While Plaintiff is
28  unbound by the confines of law, regulation, and policy when making its

determination as to the status of the Joshua tree, the Service is bound to act within its authority—which was lawfully carried out by the 12-month Finding.

QuadState notes that the Service found "no evidence to support substantial population size reductions and range contraction over the last 40 years based on distribution mapping" and that "[o]verall recruitment of both *Yucca brevifolia* and *Y. jaegeriana* is currently occurring across their respective ranges…" FWS_318. Based on a U.S. Geological Survey "empirical study conducted throughout the range" of the Joshua tree, the species is "currently distributed over several large discontinuous areas totaling 9,447,883 ac[res] of a much larger region" and has been reduced by only "3 percent compared to the historical distribution." FWS_256. The Service additionally found that best available scientific information "indicates that substantial habitat loss due to development-type activities is unlikely in the foreseeable future, in part because 74 percent of the current distribution for *Yucca brevifolia* and 89 percent of the distribution of *Yucca jaegeriana* occurs on military and federally-managed lands. FWS_275. Moreover, the Service cited to multiple studies demonstrating that even where Joshua tree distribution is impacted by future climactic conditions, these same conditions likely will produce areas of climate refugia for the species. FWS_090-93.

Even if one reviews only the information in the Complaint and Petition, however, the Service clearly does not have sufficient information indicating the Joshua tree will become endangered in the foreseeable future. Rather, *conclusions* concerning the trends or impacts of climate change would be based on speculation rather than reliable prediction. The Petition itself notes there are "uncertainties as to how precipitation will respond with climate change" and that "future demographic modeling for [the Johua tree] will benefit from estimate of size- and age-specific survival rates" because that modeling will "provide better estimates of population growth and migration rates", FWS_12798, 12804-12805, and many of the sources cited in Plaintiff's Motion recognize that data is lacking or needs additional analysis.

*See, e.g.*, FWS_801 ("…the data has not been quality checked…I am working on some differences in our methodologies between the two surveys"), *cited at* Pls. Mot. Summ. J., ECF No. 24 at 9; FWS_4494 ("[w]hile correlation analysis suggests a role for temperature in influencing Joshua tree reproduction and stand density, controlled studies are needed to test any causal relationship between temperature and Joshua tree reproduction and establishment"), *cited at* Pls. Mot. Summ. J., ECF No. 24 at 9. Further to the point, Plaintiff relies heavily on species distribution modeling to support its position that the Service erred when it declined to list the Joshua tree. *See, e.g.,* Pl.'s Complaint at ¶¶ 50-52, ECF No. 2. And yet, one of the sources cited in Plaintiff's Motion, Pl.'s Mot. Summ. J., ECF No. 24 at 9, explains:

> While species distribution models/habitat suitability metrics are increasingly easy to create for both current conditions and future conditions, ***significant uncertainty exists in these predictions due to differences between available [general circulation models][3] especially with respect to precipitation, the lack of fine-scale soil data over much of the United States, the transferability of climate envelopes across time and space, and the accuracy of the species occurrence data among other concerns***. Therefore, while we may treat these models with some confidence in the direction and magnitude of expected changes, we must also look for ways to assess the on-the-ground veracity of the predictions.

FWS_11352 (emphasis added).

Sources cited in the Complaint to support Plaintiff's contention that the species cannot survive climate change, in fact, stand for the opposite conclusion. For example, the Complaint states that although some climate models indicate there is "potential for climate change to shift conditions favorable for Joshua trees into new areas outside their current range, studies show that the Joshua tree is extremely limited in its ability to disperse beyond an average of 6.5 feet/year and thus will be

---

[3] The text refers to "GCMs", which are not defined therein. However, in the context of climate change studies "GCM" is a common acronym for "general circulation model."

unable to colonize such areas on their own." Pl.'s Complaint at ¶ 54, ECF No. 2. However, the same studies dispute that conclusion. Cornett (2022), cited in paragraph 52 of the Complaint, actually concludes that "[i]ncrease in potential dispersal distance [of Joshua tree seeds] enhances prospects for Joshua tree northward range expansion and survival in the face of climate change." FWS_6888.

The varying results of studies and models available in the Administrative Record demonstrate that specific effects of climate change on the Joshua tree are uncertain rather than likely and, thus, the Service did not err in declining to list the species as threatened on the basis of such effects. As the United States Supreme Court has previously held, a reviewing court must "be at its most deferential" where an agency is "making predictions within its area of special expertise." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 103 (1983); *see also Arizona Cattle Growers Ass'n v. U.S. Fish and Wildlife Service*, 273 F. 3d 1229, 1236 (9th Cir. 2001) (holding that "[d]eference is particularly important when the agency is making predictions within its area of species expertise, at the frontiers of science"); *Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1150 (9th Cir. 2007) ("[d]eference to an agency's technical expertise and experience is particularly warranted with respect to questions involving engineering and scientific matters."); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014) ("deference to agency determinations is at its greatest when that agency is choosing between various scientific models."). This is precisely the circumstance here: the Service has been charged with making predictions about the status of the Joshua tree relative to the potential impacts of climate change based on numerous and, sometimes, conflicting models. The Service has determined, on the basis of the best scientific and commercial data available, that the species does not meet the definition of a threatened species under section 3 of the ESA, 16 U.S.C. § 1532(20), and this Court should defer to the agency's special expertise on the matter.

## V. EXISTING CONSERVATION FOR JOSHUA TREE FURTHER SUPPORTS SERVICE DECISION NOT TO LIST

The Administrative Record makes clear that the Joshua tree benefits from substantial existing conservation. The Service's SSA establishes three categories for the varying types of open space and resource lands on which Joshua trees occur. "Status 1" lands are described as habitat that is "permanently protected from habitat conversion" and has a "mandated management plan…to maintain natural conditions, including disturbance events such as wildfire." FWS_101. "Status 2" lands are "similarly protected" but includes management practices that "may suppress natural disturbance cycles such as wildfire or native pest outbreaks." Finally, "Status 3" lands provide "permanent protection" for Joshua tree habitat but allows for "low intensity uses" including off-road vehicles as well as "isolated high intensity uses such as mining." *Id*. The SSA estimates that approximately 3 million acres of occupied Joshua tree habitat occurs in Status 1 and 2 lands. *Id*. According to the SSA, this constitutes fully 23 percent of *Yucca brevifolia* and 41 percent of *Yucca jaegeriana* distribution, and if one considers "lands…protected with allowable low intensity or isolated impacts the percentage increases to 75 percent." *Id*. As a result, the Service considers the species "largely conserved and the potential for habitat conversion…minimal across Status 1, 2, and 3." *Id*.

In addition to the fact that the vast majority of Joshua trees occur on protected lands, *Yucca brevifolia* also benefits from a statute enacted by the California legislature across its range in that state: the Western Joshua Tree Conservation Act, Cal. Fish & Game Code § 11.5 (2023) ("Conservation Act"). The Conservation Act is specifically focused on protecting *Yucca brevifolia* from the threat of climate change, provides protections to the species akin to those it would receive if it were listed under the California Endangered Species Act, and creates a fund to acquire and manage lands to conserve the species. Cal. Fish & Game Code § 2020, et seq.

Together, the location of Joshua trees primarily on federal and state lands managed for the benefit of the species and the recently enacted Conservation Act provide a measure of conservation beyond that experienced by most plant species listed as threatened or endangered under the ESA.

## VI. CONCLUSION

QuadState encourages this Court to defer to the Service in its determination that the Joshua tree does not warrant listing under the ESA. QuadState does not argue that the threat of climate change may warrant listing of some species under certain circumstances.

Respectfully submitted,

Date: November 22, 2024

NOSSAMAN LLP
PAUL S. WEILAND

By: */s/ Paul S. Weiland*
    Paul S. Weiland

*Attorneys for Proposed Amicus Curiae QuadState Local Governments Authority*

# CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 11-6.2, the undersigned, counsel of record for Proposed Amicus Curiae party, QuadState Local Governments Authority, certifies that this brief contains **3,756 words**, which:

⊠     complies with the word limit of L.R. 11-6.1.

⊠     complies with the word limit set by Court's Standing Order dated March 27, 2024.

Date: November 22, 2024

NOSSAMAN LLP
PAUL S. WEILAND

By: */s/ Paul S. Weiland*
       Paul S. Weiland

*Attorneys for Proposed Amicus Curiae QuadState Local Governments Authority*